**SO ORDERED.**

**SIGNED this 15 day of September, 2011.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:

| | |
|---|---|
| SHARON VERNELL COFIELD, | CHAPTER 7 |
| | CASE NUMBER: 10-00007-8-RDD |
| DEBTOR. | |

| | |
|---|---|
| B&W REMODELING, INC., | ADVERSARY PROCEEDING |
| | NUMBER: 10-00070-8-RDD |
| **Plaintiff** | |
| v. | |
| SHARON VERNELL COFIELD, | |
| **Defendant** | |

**ORDER HOLDING DEBT NONDISCHARGEABLE**

Pending before the Court is the Complaint Objecting to Discharge of Debt, Claim to Funds Held in Escrow, and Claim to Priority, filed by B&W Remodeling, Inc. ("B&W") on March 31, 2010 (the "Complaint"), and the Answer to Complaint Objecting to Discharge of Debt, filed by

Sharon Vernell Cofield (the "Defendant") on June 4, 2010 (the "Answer"). The Court began a hearing in Wilson, North Carolina on August 25, 2011 to consider the Complaint and the Answer.[1]

## STATEMENT OF THE FACTS

The Defendant filed a petition for relief under Chapter 7 of the Bankruptcy Code on January 1, 2010. On March 31, 2010, B&W filed the Complaint initiating this adversary proceeding objecting to the dischargeability of debt pursuant to 11 U.S.C. 523(a)(2)(A) and 11 U.S.C. § 523(a)(4), claiming right to payment of remaining funds held in restricted escrow account, and seeking to have priority for its lien against real property. On April 7, 2010, the Defendant was granted a discharge pursuant to 11 U.S.C. § 727 on all other dischargeable debts.

In 2005, the Defendant's parents conveyed to the Defendant a lot located at 46 Cofield Drive in Edgecombe County, North Carolina. The lot is located next door to the home of the Defendant's parents. The Defendant purchased and installed a double-wide mobile home on the lot. The Defendant and the Defendant's father executed a promissory note in favor of Branch Banking and Trust Company ("BB&T") to finance the purchase price of the double-wide mobile home. The promissory note is secured by a deed of trust on the Defendant's real property located at 46 Cofield Drive. At all relevant times, the Defendant had homeowner's insurance coverage with North Carolina Farm Bureau Mutual Insurance Company ("Farm Bureau"). The policy included full replacement loss coverage with dwelling loss limits of $92,000.00 and listed BB&T as the mortgage loss payee.

On March 8, 2008, the Defendant's home was significantly damaged by fire and smoke. Farm Bureau's adjuster inspected the Defendant's home and prepared a Building Estimate dated

---

[1] The hearing commenced on August 25, 2011 and additional testimony was presented on August 26, 2011.

April 7, 2008, which included an itemized listing of the costs necessary to repair the home. Based on the estimate, the Defendant was to receive both the Actual Cash Value ("ACV") coverage—the actual cost of repairs depreciated for the age of the house—and the Replacement Cost Value ("RCV") coverage—the difference between the actual cost of repairs and the amount reduced to arrive at ACV. The Building Estimate included the following totals: ( a.) Replacement Cost Value: $63,412.32; (b.) Actual Cost Value: $58,031.37; and (c.) Applicable Policy Deductible: $250.00. On April 15, 2008, Farm Bureau issued a check payable jointly to "Sharon V. Cofield and Branch Banking & Trust Company" in the sum of $57,781.37. This amount represented the the ACV for the repairs less the Applicable Policy Deductible. The check was delivered to the Defendant and deposited into a Restricted Escrow Account (the "Escrow Account") referencing Defendant's BB&T mortgage. The Escrow Account was held, maintained and disbursed by BB&T's Disbursement Clearing Office. In addition to the RCV, the Defendant received the sums of approximately $20,813.00 representing Personal Property Coverage for loss of personal property within the home, $12,332.74 to cover the hotel expenses she incurred and $10,347.00 representing the cost of cleaning services.

On April 9, 2008, the Defendant entered into and signed a written contract with B&W. Pursuant to the contract, B&W was to perform specific repairs to the Defendant's home for the total sum of $62,444.00 payable in three scheduled draws from the proceeds held in the Escrow Account. The first and second draws were to be in the amount of $20,000.00. The last draw of $22,444.00 was to be payable to B&W upon final completion. Farm Bureau reviewed and approved the contract with B&W. B&W was aware that the Defendant had made an insurance claim with Farm Bureau and that the claim covered the repairs it contracted to make. B&W however, was not aware that on April 15, 2008, Farm Bureau issued a check payable jointly to the Defendant and BB&T in the

amount of $57,781.37, which was deposited into the Escrow Account. Farm Bureau was to pay the remaining balance of $5,380.95 upon completion of the repairs.

In April of 2008, B&W commenced work on the Defendant's home. Pursuant to the terms of the contract, on April 27, 2008, B&W invoiced the Defendant after completing the first six of the seventeen tasks listed in the contract. The invoice was in the amount of $20,000.00 and detailed the tasks completed by B&W. Prior to issuing the first draw, BB&T completed a progress inspection of the Defendant's home and noted that "the mortgagor is satisfied with the repairs to date. The repairs appear to be of good workmanship." The progress inspection was dated May 6, 2008 and stated that the repairs were seventy-five percent (75%) complete. Following the progress inspection, BB&T issued and mailed to the Defendant a check, dated May 7, 2008, in the amount of $19,260.46 payable to B&W and the Defendant, representing one-third of the funds held in the Escrow Account. The Defendant paid this amount to B&W on May 19, 2008 in partial payment of B&W's first invoice.

Even though B&W had not yet invoiced the Defendant for the second $20,000.00 contract draw, the Defendant contacted BB&T and requested that B&W be paid the second distribution in the amount of $19,260.46 representing one-third of the ACV insurance proceeds held in the Escrow Account. On May 8, 2008, the day following the first distribution, BB&T issued and mailed to the Defendant a distribution check dated May 8, 2008 in the amount of $19,260.46 payable to B&W and the Defendant. The Defendant presented the second check to B&W and represented to B&W that Farm Bureau had authorized her to retain $1,646.00 from the second draw check in order for her to purchase light fixtures and blinds. She informed B&W that Farm Bureau had told her that it would reimburse B&W for these funds in the future. Accordingly, the Defendant paid to B&W $17,614.46,

4

representing the balance of the second draw check, as an advance on the second invoice which had not yet been billed to the Defendant.

On May 8, 2008, a third check was issued and written payable to the Defendant and the Defendant's father from the Escrow Account in the amount of $1,157.25 labeled "personal cont". Unknown to B&W the Defendant had requested that BB&T issue this third check. The Defendant represented in her Answer that she requested this payment from BB&T to purchase a new refrigerator. However, at the hearing, the Defendant testified that these funds were used to purchase a sink. At the hearing, Farm Bureau's Adjuster testified that the Defendant had already received funds to purchase a new refrigerator from the Personal Property Coverage at the time she requested the $1,157.25 payment from BB&T. Additionally, the Farm Bureau Estimate did not include the purchase of new light fixtures.

In June 2008, the Defendant requested that additional work be done to her home. This additional work was not provided for in the original contract. At the hearing, Jerry Wall ("Mr. Wall") testified on behalf of B&W. Mr. Wall testified that the Defendant asked B&W to perform additional work in order to make her mobile home appear more like a home. Specifically, she requested that crown molding be installed and that a portion of a wall be removed. Mr. Wall testified that B&W agreed to do the additional work relying upon the Defendant's representation that this additional work would be paid for from insurance proceeds that she was to receive in the future.

On June 30, 2008, B&W invoiced the Defendant for the second scheduled draw of $20,000.00. B&W credited the Defendant for the partial payment of $17,614.46 it received on May 28, 2008. Accordingly, B&W demanded payment in the total amount of $5,246.20 representing the unpaid balance of $739.54 due on draw one, the unpaid balance of $2,385.54 due on draw two, and the $2,121.12 owed for the additional work not provided for in the original contract.

In July 2008, B&W informed the Defendant that the remaining balance of $5,246.20 was required to be paid if B&W was to continue working on the home. The Defendant called Farm Bureau and represented that she needed a check in the amount of $5,246.20 in order for B&W to buy carpet for her house. Farm Bureau denied the Defendant's request. Once again, the Defendant represented to B&W that she did not have the funds available in order to make payment and that she did not have access to the insurance money. She represented that the insurance company would not release the funds in order to pay B&W, but she assured B&W that payment would be made from the insurance funds that she was to receive when the contract was completed. Relying on the Defendant's assurances, B&W continued working on the house. During this time, B&W purchased a new central heating and air conditioning system and kitchen cabinets. Despite Defendant's representations to B&W that she did not have the funds available to make the payments as required under the contract, on July 18, 2008 and July 29, 2008, two checks were issued from the Escrow Account payable to the Defendant and the Defendant's father in the amounts of $4,917.51 and $4,983.99 respectively. This left a remaining balance $8,201.70 in the Escrow Account. B&W was still owed for the third scheduled contract draw of $22,444.00, in addition to $5,246.20 representing the amount due on draws one and two and the extra work performed, for a total sum due to the B&W of $27,690.20.

Although, the contract with B&W included removing and replacing both the vinyl flooring and the carpet, the Defendant chose to personally pay for and install both the vinyl flooring and carpet in her home. At this point, B&W had not finished painting and preparing the house for installation of floor coverings. B&W informed the Defendant that it was unable to do anymore painting and touch up work once the carpet was installed and gave the Defendant a $1,500.00 credit

6

as B&W would be unable to sand and paint. Additionally, B&W gave the Defendant a $9,901.09 credit representing the cost of the carpet. The final balance due and owing to B&W was $16,289.11.

On August 7, 2008, BB&T completed a progress inspection of Defendant's home. The report stated that the repairs were "ninety-five percent (95%) complete. . . . [t]he mortgagor is satisfied with the repairs to date. The repairs appear to be of good workmanship."

At the hearing, the Defendant presented a video as evidence that the repairs were not completed on her home. At the time when the Defendant started recording the video, B&W had not yet completed its repairs. When the video was playing at the hearing, knocking at the door of the Defendant's home could be heard. Mr. Wall testified that on August 11, 2008, at the time the Defendant was recording the video, he and other employees of B&W were knocking on the Defendant's door because they were there to complete work on the Defendant's home. On August 11, 2008, the Defendant had prepared a list of minor tasks for B&W to complete. B&W completed these tasks and on August 13, 2008, BB&T completed its final progress inspection of the Defendant's home. At this inspection, the Defendant represented to the BB&T inspector that the repairs were satisfactory to her. The inspection report showed that the repairs were "100% complete and that the repairs appeared to be of good workmanship." Two days later, on August 15, 2008, BB&T released the remaining funds from the Escrow Account in the amount of $8,201.70 made payable jointly to B&W and the Defendant. After these funds were released, the Defendant complained to B&W as to the quality of the workmanship and that the repairs were incomplete. Subsequently, the Farm Bureau Inspector made his final inspection of the home and upon finding that the work was complete offered to disburse the Depreciation funds in the amount of $5,380.95 as provided for in the building estimate to the Defendant so she could pay these funds to B&W. The Defendant refused to accept payment of this amount and demanded that the Farm Bureau Inspector

pay her additional money than she had originally agreed to accept. Eventually, Farm Bureau issued a check payable jointly to the Defendant and BB&T in the amount of $5,380.95 representing the Depreciation funds. The Defendant never informed B&W that she had received this check and she did not pay B&W any funds from this check.

In October 2008, the Defendant unilaterally cashed the Depreciation check in the amount of $5,380.95, without B&W ever knowing that the check had been received by the Defendant. In a letter sent to BB&T dated December 19, 2008, the Defendant requested, due to unforseen circumstances, that BB&T return the check in the amount of $8,201.70 to her account.

The Defendant refused to pay B&W the remaining amount owed. On October 14, 2008, in accordance with N.C. Gen. Stat. § 44A-12, B&W filed and served Notice of Clam of Lien for non-payment for labor and materials in repair made to the Defendant's home. On January 9, 2009, B&W filed suit on the Claim of Lien in the civil action captioned "B&W Remodeling, Inc. v. Sharon V. Cofield", Edgecombe County, Case No. 09-CVS-39. One week prior to the trial, the Defendant filed a petition for relief under Chapter 7 of the Bankruptcy Code on January 1, 2010.

In her petition, the Defendant listed the $4,000.00 returned to the Escrow Account by the Defendant in Defendant's Schedule B - Personal Property - Amended in paragraph 2 as "BB&T - Insurance proceeds for home repairs." In paragraph 8 of the Defendant's Amended Schedule C-1 - Property Claimed as Exempt, the Defendant claimed $4,000.00, one-half of the $8,000.00 funds representing the insurance proceeds as exempt. B&W objects to this exemption.

## STATEMENT OF THE CASE

B&W requests that the Defendant be denied discharge of the debt owed to B&W for labor and materials to repair damage caused by fire and smoke to Debtor's home pursuant to 11 U.S.C. § 523(a)(2)(a) and (4). B&W argues that pursuant to 11 U.S.C. § 523(a)(2)(A), the debt owed by

the Defendant to B&W is nondischargeable because the Defendant obtained the services and property by false pretenses, a false representation, or actual fraud. Additionally, B&W contends that pursuant to 11 U.S.C. § 523(a)(4) the debt owed by the Defendant to B&W is nondischargeable because the debt was for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. The Defendant argues that B&W has failed to meet the elements of nondischargeability under both § 523(a)(2)(A) and § 523(a)(4) and that at most, the Defendant has raised a claim for breach of contract, which indebtedness would be dischargeable.

## DISCUSSION

Pursuant to 11 U.S.C. § 523(a)(2)(A), an individual will not be discharged of any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - false pretenses, a false representation or actual fraud . . . ." A creditor seeking to exempt a debt from discharge must establish all of the elements of fraud: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of the damages." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007). Obtaining property or services by false pretenses is shown when: (1) a false representation is made by Defendant to Plaintiff, (2) calculated and intended to deceive, (3) which in fact deceived Plaintiff, and (4) Defendant obtained money, property or services from the Plaintiff. N.C.P.I. — Crim. 219.10. Obtaining Property by False Pretenses. Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation when acting in a fiduciary capacity, embezzlement or larceny." A creditor seeking to exempt a debt from discharge must establish the existence of both: (a) a fiduciary relationship, and (b) fraud or defalcation while acting in that fiduciary capacity. *Central Bank, Inc. v Burton (In re Burton)*, 416 B.R. 539, 542 (Bankr. N.D. W.Va. 2009) (citations omitted). The "standard of proof for dischargeability exceptions in 11 U.S.C. §523(a) is the

9

preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991). B&W concedes that Defendant was not acting in a fiduciary capacity. Therefore, B&W solely relies on 11 U.S.C. § 523(a)(2)(A).

The primary issue here is whether the debt was obtained by false pretenses, false representation or actual fraud. The creditor's level of reliance on the debtor's false representation requires justifiable, but not reasonable reliance. *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Quoting the Restatement (Second) of Torts (1976), the United States Supreme Court stated that "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 70 (quoting the Restatement (Second) of Torts § 1976)). The Court went on and noted that "[a]lthough the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." *Id.* at 70-71 (quoting the Restatement (Second) of Torts §545A(1976)).

The creditor is not required to show direct evidence of the debtor's intention to deceive. "Because direct proof of intent is seldom available, the court in a dischargeability proceeding may infer the debtor's intent or lack of intent from the surrounding facts and circumstances."*Randle v. Highfill (In re Highfill)*, 336 B.R. 701, 707 (Bankr. M.D.N.C. Jan. 26, 2006).

Here, the Court finds that the Defendant obtained property or services by false pretenses, false representation and actual fraud. The Court finds that B&W has met its burden of proof to establish the debt as nondischargeable. Throughout the course of dealings between the Defendant and B&W, the Defendant made numerous false representations upon which B&W justifiably relied.

On April 9, 2008, the Defendant entered into and signed a written contract with B&W. The contract required the Defendant to pay B&W the sum of $62,444.00 payable in three scheduled draws. At the hearing, the Defendant testified that throughout her course of dealings with B&W, she told B&W the insurance company would pay for the repairs.

The Defendant represented to B&W that Farm Bureau Insurance had authorized her to receive $1,646.00 from the second draw of the insurance funds paid jointly to the Defendant and B&W in order for her to purchase light fixtures and blinds. She assured B&W that Farm Bureau told her it would reimburse B&W for releasing these funds to her. In fact, the insurance company never authorized the Defendant to use the ACV insurance proceeds to pay for light fixture nor did it agree to reimburse B&W for the distribution. B&W justifiably relied on the Defendant's representation. B&W had no relationship with the insurance company and justifiably believed the Defendant was being truthful. After all, there was significant fire damage and it was reasonable to assume the Defendant had insurance.

B&W never received reimbursement for the $1,646.00 it released to the Defendant from the second draw. At this point B&W was owed the total amount of $5,246.20 representing the unpaid balance of $739.54 due on draw one, the unpaid balance of $2,385.54 due on draw two, and the $2,121.12 owed for the additional work that B&W performed and was not provided for in the contract. B&W demanded payment in full of the $5,246.20 amount. Defendant told B&W that Farm Bureau refused to release the funds to pay for the work on her home. She assured B&W that she would call the Farm Bureau office and get the checks issued. In fact, the Defendant did call Farm Bureau and represented that she needed a check in the amount of $5,246.20, the exact amount due to B&W, in order for B&W to buy carpet for her house. Farm Bureau denied the Defendant's request. The Defendant then told B&W that the balance due on draws one and two, plus payment

11

for the extra non-contract work B&W performed in June 2008, would be paid from the insurance proceeds and that the Defendant would receive payment once the job was finished.

Unknown to B&W, the Defendant already had the ACV funds on deposit in the Escrow Account and was using her access to the account to withdraw funds. The Defendant never requested payment from the ACV insurance funds to pay B&W for its contract work. The Defendant did however have a check issued and written payable to the Defendant and the Defendant's father in the amount of $1,157.24 dated May 8, 2008. Additionally, on July 18, 2008 and on July 29, 2008, the Defendant had two checks issued from the Escrow Account in the amounts of $4,917.51 and $4,983.99, respectively. The checks were written payable jointly to the Defendant and the Defendant's father. This left a balance of $8,201.70 left in the Escrow Account. Based on the false representations of the Defendant, B&W continued performing contract work on the Defendant's home and continued obtaining and paying for materials in the house, and continued engaging and paying subcontractors to install systems throughout the home, justifiably relying on these false representations that the insurance company would pay the balance, when the Defendant had already received the funds to pay B&W.

On August 13, 2007, BB&T completed its final progress inspection of the Defendant's house. The Defendant stated to BB&T's inspectors that she was satisfied with B&W's work. Accordingly, two days later on August 15, 2008, BB&T released the remaining funds from the Escrow Account in the amount of $8,201.70 made payable jointly to B&W and the Defendant. Although, the Defendant represented to BB&T that she was satisfied with B&W's work, she contemporaneously complained to B&W that the work on her house was defective. The Defendant received the ACV insurance funds in the amount of $8,201.70, but refused to pay B&W. Upon its inspection of the Defendants home, Farm Bureau eventually released the Depreciation check in the

amount of $5,380.95. The check was payable jointly to the Defendant and BB&T. The Defendant never informed B&W that she received this check and she did not pay B&W any funds from this check. In October 2008, the Defendant unilaterally cashed and deposited the Depreciation check into her personal account, without B&W ever knowing that the check had been received by the Defendant. At the hearing, the Defendant was questioned by the Court as to why she believed that the check belonged to her even though it was payable jointly to her and B&W. The Defendant was unable to answer this question.

The Defendant made numerous false representations upon which B&W justifiably relied. The aggregation of these representations results in false pretenses, a false representation or actual fraud and in actuality were a fraudulent scheme by the Defendant to keep the funds for herself rather than pay B&W. In furtherance, of this fraudulent scheme, the Defendant never applied for a Certificate of Occupancy, when only a few very minor items were required to be fixed including loose receptacle plates, lack of access to hot water heater, shower surround not properly installed, and a loose electrical receptacle in the kitchen, all of which could have been fixed for little money. No testimony was received as to the amount necessary to complete these minor repairs. Additionally, these items were noted in the inspection which was conducted on January 21, 2011, nearly two and a half years after B&W completed its work on the home. B&W had substantially performed under the contract. There was no material default to justify not making payment to B&W when the Defendant had the funds to do so and had intentionally diverted some of the funds for her personal use. Even though B&W gave the Defendant a credit of $1,500.00, the Court credits the total amount due and owing an additional $1,444.88 for any minor punch list items B&W was unable to complete. The Court finds the final balance due and owing to B&W is $14,844.23.

Therefore B&W is entitled to recover from and have judgment entered against the Defendant the sum of $14,844.23 plus interest as allowed by law from August 25, 2011.  BB&T is ordered to turnover to B&W the sum of $8,201.70.  The Defendant's exemption of any amount of the funds remaining in the Escrow Account is **DISALLOWED** and Defendant's objection to this claim of exemption is **SUSTAINED**.  B&W's materialmen's lien pursuant to N.C. General Statutes § 44A is perfected as of the date of the first furnishing of labor or materials at the site of the Debtor's home pursuant to N.C. General Statutes §44A-10 and is not avoidable pursuant to 11 U.S.C. § 522(f).  B&W is awarded reasonable attorneys' fees in the amount of $56,037.71.[2] All damages awarded and reasonable attorneys' fees are **NOT DISCHARGED**.

The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**

**END OF DOCUMENT**

---

[2]On September 7, 2011, attorney for B&W filed an affidavit stating the reasonable attorneys' fees and costs.  The reasonable out-of-pocket expenses and court costs incurred on behalf of B&W was $1,002.71.  The reasonable attorneys' fees incurred and billed to B&W in this matter was $55,035.00.  The reasonable attorneys' fees and costs incurred by B&W in prosecuting this case against eh Defendant was $56,037.71.   The effective hourly rate charged by the attorney for B&W was $160.00 per hour.  No objection was filed to the affidavit.